IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE M. CLAGG, | ) | Case No. 1:17-cv-194 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Dianne M. Clagg seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and Clagg has failed to identify any error of law in the ALJ's evaluation of her claim, I recommend that the final decision of the Commissioner be **AFFIRMED.**

## II.      Procedural History

Dianne M. Clagg protectively applied for supplemental security income and disability insurance benefits on March 31, 2014. (Tr. 164) She alleged a disability onset date of November 1, 2013. (Tr. 164) Clagg's application was denied initially on June 9, 2014 (Tr. 118-120) and after reconsideration on October 3, 2014. (Tr. 122-124) On December 12, 2014, Clagg requested

an administrative hearing. (Tr. 82) Administrative Law Judge ("ALJ") Susan G. Giuffre heard the matter on April 27, 2016. (Tr. 41-74) The ALJ found that Clagg was not disabled in a June 17, 2016 decision. (Tr. 16-40) The Appeals Council denied review on December 7, 2016, rendering the ALJ's conclusion the final decision of the Commissioner. (Tr. 1-6) On January 31, 2017, Clagg filed this action challenging the Commissioner's final decision. ECF Doc. 1.

III.    **Evidence**

A.    **Personal, Educational and Vocational Evidence**

Clagg was born on March 31, 2014 and was 52 years old on the alleged disability onset date. (Tr. 164) She lived with her husband and ten year old daughter. (Tr. 49) She had worked for a long time as a claims examiner for Medical Mutual. (Tr. 46-47)

B.    **Medical Evidence**

Primary care physician, Jason Komitau, M.D., began treating Clagg in March 2010. (Tr. 432) In January 2013, Clagg told Dr. Komitau that she was having a nervous breakdown because she could not handle her left knee pain anymore. She was told that she needed a knee replacement, but the surgeon would not replace her knee until she lost weight. She was taking Celebrex and Percocet, but the Percocet was not working anymore. Clagg appeared depressed but her affect was otherwise appropriate; she maintained good eye contact and answered questions appropriately. Dr. Komitau diagnosed anxiety disorder, depression, hypertension and chronic knee pain and prescribed a trial of Cymbalta and referred Clagg to an orthopedic surgeon. (Tr. 336-337)

Clagg also treated with pain management specialist Sanjay Kumar, D.O. from at least December 2012 through March 2016. (Tr. 374, 515-525) At a visit on January 2013, Clagg cried because she was tired of the pain. (Tr. 373) In April 2013, Clagg complained that her knee pain

was worsening. (Tr. 370) In June 2013, Clagg complained that her back pain had flared up. (Tr. 369)

In August 2013, Clagg complained that her arthritis in her knees and lower back was getting worse and she was having neck pain and trouble sleeping. (Tr. 324) Examination showed normal gait, full range of motion in knees, elbows and hands, full range of motion in neck but "some" discomfort. (Tr. 325) X-rays showed grade I spondylolisthesis in the cervical spine and bone-on-bone contact at the left knee and near bone-on-bone contact at the right knee. (Tr. 328)

Clagg consulted with orthopedic surgeon Alfred Serna, M.D. in September 2013 for evaluation of her left knee. (Tr. 303) X-rays showed severe osteoarthritis of medial compartment on the left, moderate to severe on the right. There was also subluxation of the patella on the left side. (Tr. 303) Dr. Serna indicated Clagg was not a candidate for total knee replacement because of her age, obesity and poor blood flow in her legs. Instead, Clagg received Synvisc 1 injections in both knees in November 2013. (Tr. 300, 303)

Clagg saw Dr. Komitau on October 1, 2013 who diagnosed chronic pain, generalized osteoarthritis of multiple sites and morbid obesity. Dr. Komitau discussed the importance of weaning off narcotics and started Clagg on a trial of Lyrica. He also referred her to physical therapy. (Tr. 319)

Clagg presented for physical therapy on October 17, 2013. She complained of pain in her lower back, neck and both knees that had worsened over the past year. Clagg's knee appeared normal but was tender to palpation with minimal pressure. Her gait was described as "symmetrical stance time with and without cane; decreased stride/decreased cadence." (Tr. 315-316)

X-rays taken on October 28, 2013 showed mild arthritic changes of Clagg's thoracic spine. (Tr. 376) They also showed anterolisthesis up to grade I-II at multiple levels and severe disc loss space. Lumbar X-rays also revealed new or worsening anterolisthesis at L4-L5 when compared to prior studies from April 2012. (Tr. 375)

Clagg met with Dr. Komitau on November 19, 2013. He noted a depressed mood with flat affect but indicated she had good eye contact and answered questions appropriately. Dr. Komitau restarted Cymbalta. (Tr. 346)

In a November 21, 2013 office visit with Dr. Kumar, Clagg reported that her pain varied. She stated that she needed Celebrex and that Percocet helped. Her right knee felt better after injections from Dr. Serna, but her left knee was still bothering her. Pain was affecting her qualify of life. (Tr. 364) Examination findings from 2013 showed decreased range of motion of the lumbar spine; significant arthritic deformities; crepitus and decreased range of motion in both knees; swelling in the legs; and antalgic gait. (Tr. 363, 364, 366, 374) Clagg was using a cane for ambulation. (Tr. 367) Radiofrequency ablation of the lumbar spine in June and July 2013 seemed to help Clagg's low back pain initially, but in September 2013, she stated that it had not helped that much. Dr. Kumar prescribed a back brace. (Tr. 366)

In February 2014, Clagg told Dr. Kumar's office that she had been sewing a lot lately, which caused pain in her arms and woke her up at night. (Tr. 361) In June 2014, she complained of worsening pain in her neck and her lower back had been bothering her as well. (Tr. 407) In October 2014, Clagg also began to complain of right shoulder pain. (Tr. 446) In November 2014, Clagg continued to complain of pain. Her back brace and medication were helping. She was starting to have difficulty with hand pain and found it difficult to open jars or hold milk. (tr. 448) Physical examination included findings of Tinel's and Phalen's signs in both wrists; tenderness

in lumbar muscle with positive facet joint maneuvers; limited range of motion of the right shoulder, neck, lumbar spine and both knees; limited heel and toe walking. (Tr. 361, 405, 407, 444, 451. Dr. Kumar managed Clagg's medications. Facet joint blocks in the cervical spine in June and July 2014 helped her neck pain, but not the pain going down her arm. (Tr. 405) Radiofrequency ablation in July and August 2014 provided 40-50% pain relief. (Tr. 444)

X-rays taken in June and July 2014 showed anterolisthesis. A cervical spine MRI in August 2014 revealed disc herniation at C4-C5 and C5-C6. (Tr. 440-441) An EMG and nerve conduction study of the upper extremities in August 2014 returned normal results with the exception of sensory fiber demyelination, mild on the left and moderate on the right. (Tr. 413)

Clagg received chiropractic treatment from Geoffrey Poyle, D.C. from April 2014 to June 2014. (Tr. 391-399) Clagg reported worsening low back pain radiating to her left buttock and calf. (Tr. 391) Examinations showed moderate tenderness in the cervical, thoracic and lumbar spine and restricted range of motion of the lumbar spine and right hip. Kemp's and Yeoman's tests were positive bilaterally. (Tr. 391-392) In September 2014, Dr. Poyle noted that Clagg showed some improvement but that her prognosis was poor. (Tr. 398-399) On September 3, 2014, Dr. Poyle completed a short questionnaire indicating that Clagg had been compliant with therapy but that it had only provided mild, transient improvement. (Tr. 430)

On September 15, 2014, Clagg met with Caryn DeLisio, CNP, for a pain management follow-up. During this appointment, Clagg complained of unbearable pain in her left arm. However, she had not yet gotten her wrist splints for carpal tunnel. (Tr. 444) Clagg reported that the Percocet helped to some degree; it helped her care for her daughter and do some activities of daily living. (Tr. 444) Clagg had a strong grasp and a mildly positive Tinel sign bilaterally. (Tr.

444) She ambulated with a slow gait and had some decreased range of motion in the low back, but had negative straight leg raise and normal coordination. (Tr. 444)

Clagg's neck, back and knee pain and numbness and pain in her arms and hands continued in 2015. In January 2015, Clagg reported to Dr. Kumar that her pain was about 3/10 and it worsened with activity and walking. (Tr. 453) The position that provided the most relief was lying on her side. (Tr. 453) Clagg still had anxiety in June 2015 and Zoloft was increased. (Tr. 605, 607)

In March 2015, Clagg saw Dr. Komitau for anxiety and depression. She reported that she was very stressed at home, "Husband cheating on me, drinking heavily. In pain all the time. Worried about her daughter." Clagg's mood was depressed with a flat affect; she was crying and angry, but she made good eye contact and answered questions appropriately. (Tr. 588) Dr. Komitau prescribed Zoloft and Xanax. (Tr. 588)

On May 18, 2015, Clagg reported to Ms. DeLisio that facet joint injections to her cervical spine had not offered any relief. (Tr. 465) On June 10, 2015, Clagg reported continuing joint pain despite treatment for pain management. (Tr. 614) X-rays taken on June 10, 2015 showed no degenerative arthritis or other articular disease in Clagg's wrists, shoulders and elbows, but mild degenerative arthritis at the A.C. joints. (Tr. 621)

In July 2015, Clagg reported to Ms. DeLisio that she was having a bad month and the numbness in her hands was getting worse. She no longer had her carpal tunnel splints and wanted another prescription for those. (Tr. 471) X-rays taken on July 16, 2015 showed diffuse arthritis and multilevel spondylolisthesis of Clagg's lumbar spine. (Tr. 439)

Dr. Komitau referred Clagg to rheumatologist, Cassandra Calabrese, D.O., a fellow at the Cleveland Clinic Foundation. Plaintiff met with Dr. Calabrese on August 13, 2015. (Tr. 654)

Clagg reported lower back and neck pain and osteoarthritis of the knees. Examination showed significant spinal point tenderness around L1 as well as paraspinal in the lower back. She had limited lumbar and cervical spine range of motion due to pain. Dr. Calabrese noted that Clagg's pain was disproportionate to the extent of her osteoarthritis and that "she may have a secondary chronic widespread pain syndrome." (Tr. 657) Dr. Calabrese also noted that Clagg's weight was a "big contributor to her joint pain, specifically in the knees and low back." (Id.) Clagg was not interested in bariatric surgery. (Id.) Dr. Matthew Bunyard, the Cleveland Clinic physician who reviewed Dr. Calabrese's assessment, noted: "Although she has some degenerative changes, her pain seems out of proportion. Would consider other etiologies of pain including [fibromyalgia syndrome]." (Tr. 658)

Clagg received a cervical epidural steroid injection in August 2015. (Tr. 473-475) In September and October 2015, Dr. Kumar performed a set of five injections into both knees. (Tr. 482, 484, 486, 489, 491) In November he provided a third set of facet joint blocks in Clagg's cervical spine, which helped about 50%. (Tr. 502)

On December 9, 2015, Clagg reported sleep disturbance. (Tr. 504) Examination at this appointment revealed similar findings with the addition of spasms of the cervical and lumbar back. (Tr. 505) Dr. Kumar noted that Clagg's options were limited. He encouraged her to resume exercise in the pool. (Tr. 505)

Clagg continued to have cervical and lumbar spasms in January and February 2016. She also had decreased range of motion of the cervical and lumbar spine and both knees, and swelling in both knees. (Tr. 512, 517-518) Clagg received a left knee injection on January 13, 2016. (Tr. 509)

In March 2016, Clagg reported pain in her neck, back, both knees and right hip. (Tr. 520) She rated the pain as 6/10 with medication. (Tr. 522) Clagg was very depressed and reported that she had more bad days than good. She continued to report sleep disturbance. (Tr. 522) Ms. DeLisio noted antalgic gait; decreased range of motion of the cervical spine, low back, and both knees; tenderness to palpation of the lumbar facets with positive provocative maneuvers; both knees had arthritic deformity, crepitus, and mild swelling; and tender points with palpation in the upper extremities and upper body consistent with fibromyalgia. Clagg wore a back brace and right wrist splint and used a cane. (Tr. 523) Dr. Kumar continued Percocet but was hesitant to add any new medications due to her emotional state. He referred her to a pain psychologist/psychiatrist. (Tr. 524)

Clagg met with rheumatologist, Dr. Calabrese, again in March 2016. Dr. Calabrese noted significant spinal point tenderness around her lower cervical spine. Clagg had limited lumbar spine and cervical spine range of motion due to pain. She also had painful abduction of right shoulder. (Tr. 680) Clagg was tearful during this visit. Dr. Calabrese prescribed Neurontin and Cymbalta. She also discussed with Clagg the importance of losing weight and referred her to pool therapy and to a spine specialist. (Tr. 681) Dr. Calabrese had ordered x-rays of the knees, lumbar and cervical spine during Clagg's August 2015 visit. Clagg did not get them done, telling Calabrese that she'd had them taken through the order of her pain management doctor. Dr. Calabrese noted other recommendations that Clagg had not followed. (Tr. 677-678)

Clagg presented to physical therapy for chronic neck pain on March 14, 2016. At an appointment on March 23, 2016, she reported pain on both sides of her neck that would travel down both arms at times. She could not sleep well and was losing strength in her arms. Clagg stated that she was planning to see a pain psychologist for her depression. (Tr. 533) Examination

showed tenderness at the cervical facet joints and paraspinals, and limited cervical range of motion. Clagg walked with a cane. (Tr. 534)

### C.     Opinion Evidence

#### 1.     Reviewing Physician, William Bolz – May 2014

William Bolz, M.D., reviewed Clagg's records for the state agency on May 13, 2014 and opined that she could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. (Tr. 100) He felt that Clagg could stand/walk four hours and sit six hours in an eight-hour workday. (Tr. 100) Dr. Bolz also opined that Clagg could frequently climb ramps or stairs, could occasionally climb ladders, ropes or scaffolds, and could occasionally balance, stoop, kneel, crouch and crawl. (Tr. 100-101)

#### 2.     Reviewing Psychologist – Todd Finnerty – June 2014

Todd Finnerty, Psy.D. reviewed Clagg's records for the state agency on June 9, 2014 and opined that plaintiff's mental impairments were not severe and that she had no restrictions in activities of daily living, social functioning, concentration, persistence or pace. (Tr. 98-99)

#### 3.     Reviewing Physician – Stephen Sutherland – September 2014

Stephen Sutherland, M.D., reviewed plaintiff's records for the state agency on September 22, 2014 and opined that plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. He felt that she could stand/walk for two hours and sit for six hours in an eight-hour workday. (Tr. 113) Dr. Sutherland opined that Clagg could frequently balance and stoop, could occasionally crouch and climb ramps or stairs, but could never kneel, crawl, climb ladders, ropes or scaffolds. (Tr. 113) He opined that Clagg could frequently finger and handle, and should avoid concentrated exposure to cold and vibration and any exposure to hazards. (Tr. 114)

### 4.    Reviewing Psychologist – David Demuth, M.D. – October 2014

On October 3, 2014, David Demuth, M.D., reviewed Clagg's records and generally agreed with the opinions expressed by Dr. Finnerty in June 2014, except that Dr. Demuth felt that Clagg had mild restrictions in activities of daily living, as opposed to none. (Tr. 110-111)

### 5.    Consulting Psychologist – James Spindler, M.S. – May 2014

Psychologist James Spindler performed a consultative examination of Clagg on May 22, 2014. Plaintiff reported that her reason for applying for disability benefits was that she had severe arthritis that rendered her unable to work. (Tr. 383) Plaintiff denied visiting a mental health specialist and described her anxiety as occasional and her depression as "seldom" in nature. (Tr. 385-386) Plaintiff appeared to be functioning in the average range of intelligence and did not have any major difficulty staying focused. (Tr. 386, 388) She seemed "upbeat and relaxed" and did not appear to be depressed. (Tr. 385) Plaintiff could recall five of five objects after five minutes and accurately recited six digits forward and four digits backward. (Tr. 386) Dr. Spindler concluded that Clagg "appears to be free of serious mental problems." (Tr. 387) He found her to be suffering no functional limitations that would impact her ability to respond appropriately in most job settings. (Tr. 388)

### 6.    Treating Physician – Jason Komitau, M.D. – August 2015

On August 17, 2015, treating physician, Jason Komitau, M.D. completed a medical source statement regarding Clagg's physical abilities and limitations. (Tr. 431-432) Dr. Komitau stated that Clagg reported she was limited to 15 minutes of standing/walking and sitting. He opined that she was able to occasionally carry 5 pounds. He stated that she was having difficulty and would only occasionally be able to use her fingers for fine manipulation and for handling items. She was also limited and would only be able to occasionally reach. When asked to

comment on Clagg's mental limitations due to pain, Dr. Komitau wrote, "Diane's condition comprises her ability to function in a work related or stressful situation. Lack of sleep, comfort and decreased cognitive function are hampered by chronic wide spread pain. Daily mental and physical function is determined by the use of medication for pain, depression and anxiety. I do not feel that given her current QoL that she will be able to perform any adequate work." (Tr. 432)

### D. Testimonial Evidence[1]

#### 1. Testimony of Diane Clagg

Clagg testified as follows at her hearing:

- Clagg graduated from high school and took a couple of college courses. (Tr. 46)

- Clagg last worked on October 31, 2013 for Medical Mutual. She worked from home processing medical claims. She stopped working for Medical Mutual when it offered a voluntary separation payout. She felt that her back, neck and hand issues were making it difficult for her to continue working. (Tr. 47-48)  Clagg's hands would hurt and go numb when she was working at her computer. (Tr. 56)

- Clagg lived with her husband and 10 year old daughter. (Tr. 49)  They helped her with most of the chores around the house. Clagg did dishes and laundry but required assistance and took frequent breaks. (Tr. 50)

- Clagg could drive but used a neck brace while driving. (Tr. 50) Clagg drove her daughter to school. Her daughter and husband helped her with grocery shopping. (Tr. 51)  She wore a back brace while grocery shopping. (Tr. 51)

- Clagg had worn a back brace and used a cane for years. Dr. Kumar recommended both of these items. Clagg used her cane for most walking. Her legs went numb and she feared that she would fall. (Tr. 52)  She also used wrist braces three or four days a week when her hands hurt. (Tr. 58-59)  Dr. Kumar had also prescribed a handicapped placard. (Tr. 59)

- Clagg spent much of her time lying in bed. She did not sleep well at night and her medications made her sleepy. (Tr. 54)

---

[1] Jon Ressler, a vocational expert ("VE"), also testified at plaintiff's hearing. (Tr. 62-72)  Because Clagg's challenge to the ALJ's decision is unrelated to the VE's testimony, it is unnecessary to summarize that evidence.

- Clagg had recently been diagnosed with fibromyalgia. (Tr. 60)  She was going to start a program at the Cleveland Clinic for chronic pain. She had already started aqua therapy. (Tr. 60-61)

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. Id.

## V.      The ALJ's Decision

The ALJ issued a decision on June 17, 2016. A summary of her findings is as follows:

1. Clagg met the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 21)

2. Clagg had not engaged in substantial gainful activity since November 1, 2013, the alleged onset date. (Tr. 21)

3. Clagg had the following severe impairments: osteoarthritis, unspecified arthropathies, obesity, asthma, hypertension, and bilateral carpal tunnel syndrome. (Tr. 21)

4. Clagg did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 24-26)

5. Clagg had the residual functional capacity to perform light work, except her standing and walking were limited to 2 hours of 8 and sitting was limited to 6 hours of 8. She could never operate pedals while standing. She could occasionally operate pedals while sitting. She could frequently operate hand controls. She could climb ramps or stairs occasionally. She could never climb ladders, ropes, or scaffolds. She could frequently balance and stoop. She could never kneel. She could occasionally crouch. She could never crawl. She was required to avoid concentrated exposure to the extremes of cold and vibration. She was required to avoid all exposure to hazards such as industrial machinery and unprotected heights. (Tr. 26)

6. Clagg was capable of performing her past relevant work as a claims examiner. (Tr. 34)

These findings prompted the ALJ to conclude that Clagg had not been under a disability from November 1, 2013, the alleged onset date, through the date of the ALJ's decision. (Tr. 35)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

### B.    Treating Physician Rule

Clagg argues that the ALJ failed to properly apply the treating physician rule. Specifically, she contends that the ALJ erred in failing to state good reasons for assigning little weight to the opinion of Dr. Komitau. Clagg argues that Komitau's opinion was adequately supported and consistent with evidence in the record. She points to some of the evidence consistent with Komitau's opinion and contends that the ALJ did *not* point to any inconsistent evidence in her decision. Clagg also argues that the ALJ's reliance on Clagg's activities of daily living was misplaced. She submits that these were activities she could do intermittently and with help, not activities she could sustain through her individual effort for a full work schedule.

Evidence from treating doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). The ALJ must examine what work the treating source performed. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight that takes into account how long and how frequently the doctor treated the patient, how well supported the opinion is, and whether the opinions of the source are consistent with the totality of the medical evidence in the record. The ALJ must also pay attention to whether the doctor is a specialist in the field of medicine in which she/he is

expressing an opinion. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted). However, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

Regarding Dr. Komitau's opinion, the ALJ stated:

On August 17, 2015, the claimant's primary care physician, Jason Komitau, M.D., submitted a medical source statement on the claimant's physical abilities and limitations, in which he opined that due to "severe osteoarthritis in both knees, and cervical and lumbar sacral degenerative disk disease that is compromised and

exacerbated by morbid obesity," the claimant reported that she was able to stand, walk, and sit for a total of 15 minutes at one time. He also stated that the claimant has difficulty lifting and carrying because of intense pain when walking, standing, and sitting and because of the use and need of mobility devices, and can only lift 5 pounds occasionally. Additionally, he opined that the "encroaching joint osteophyte at the C4-C5 disc space is causing significant cervical radiculopathy," and the claimant can only occasionally handle and finger bilaterally (8F/1). Dr. Komitau further opined that due to limited range of motion, the claimant could only occasionally reach bilaterally. He [] further stated the claimant's condition:

*Compromises her ability to function in a work related or stressful situation. Lack of sleep, of comfort and decreased cognitive function all hampered by chronic wide spread pain. Daily mental and physical function is determined by the use of medication for pain, depression and anxiety. I do not feel that given her current quality of life that she will be able to perform adequate work.*

He further opined that:

*Chronic widespread pain and the medication needed to provide some degree of functionality completely limits this patient from being able to physically or emotionally engage in any form of employment. (8F/2).*

In considering Dr. Komitau's opinion, it is noted that he is a treating source, 20 CFR 404.1527(a) and SSR 96-02p, provide that his opinion may be entitled to controlling weight, if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the case record. It is noted that Dr. Komitau has a longitudinal treatment history with the claimant, having seen her since March 2010 (2F; 8F; 14F). However, under 20 CFR 404.1527d and SSR 96-5p, a statement [] that the claimant is disabled or unable to work is not a medical opinion, but an administrative finding dispositive of the case, and an issue reserved to the Commissioner. Opinions on issues reserved to the Commissioner can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence to which they are supported by the record as a whole or contradicted by persuasive evidence (Social Security Ruling 96-5p). Dr. Komitau's opinion is also inconsistent with the evidence as a whole as it relates to the claimant's overall function, and course of treatment. Furthermore, he does not establish an adequate basis for his opinion and there is a lack of reference to supportive diagnostic testing. Instead, treatment records reveal that the claimant is able to do a variety of activities including driving, shopping, watching television, and sewing, and that the claimant obtains relief from medication and chiropractic therapy, as discussed above. For the foregoing reasons, the undersigned gives this opinion little weight.

(Tr. 32-33)

Earlier in her decision, the ALJ thoroughly discussed the record medical evidence. (Tr. 27-31) As to Dr. Komitau's opinion, the ALJ acknowledged Clagg's long-standing relationship with the doctor and identified him as a treating source. However, she properly refused to accept his conclusory statements that Clagg was disabled and/or unable to work. This was an issue reserved to the Commissioner. The ALJ is not bound by disability conclusions of treating physicians, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

The ALJ noted that Dr. Komitau's opinion that Clagg was able to walk and sit for only 15 minutes was based on Clagg's own subjective reports. (Tr. 32, 431) This is apparent from Dr. Komitau's report and Clagg has not argued otherwise. Thus, ALJ was justified in finding these estimates of Clagg's ability to stand/walk not to be medical evaluations but only the patient's own subjective reports.

The ALJ also found that Komitau's opinion was inconsistent with the evidence as a whole and that he had not established an adequate basis for his opinion or pointed to supportive diagnostic testing. It would have been helpful if the ALJ had again cited specific parts of the medical record which she found were inconsistent with Komitau's opinion. But the ALJ had already thoroughly discussed the medical evidence in the record and pointed to evidence suggesting that Clagg's impairments were not as severe as Dr. Komitau's estimations implied. For example, the ALJ cited X-rays showing mild findings and little progression of Clagg's degenerative disc disease. (Tr. 28) She concluded that there was no evidence that any ever prescribed the use of a cane. (Tr. 28) She identified numerous records indicating that Clagg had

not had time for or simply chose not to follow through with prescribe treatments. (Tr. 28-29) Each of these findings supported the ALJ's conclusion that Dr. Komitau's opinions should be discounted.

Conversely, Clagg has pointed to evidence in the record supporting Dr. Komitau's opinions. ECF Doc. 12, Page ID# 797-798. However, the substantial evidence standard presupposes a "zone of choice," within which the ALJ may decide without interference from the courts. *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006). Even if a reviewing court would resolve the factual issues differently, when supported by substantial evidence, the Commissioner's decision must stand. See *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). The issue for the court is not whether some evidence supported the conclusion advocated by the claimant. Here there was some. Instead, the court must decide whether the Commissioner failed to identify good reasons to support the ALJ's decision. Here, there was no such failure.

The Commissioner assigned little weight to the opinion of Dr. Komitau because: some of his opinions were conclusory; some of them were based only on Clagg's subjective reports; he did not identify an adequate basis or supportive diagnostic testing; his opinions were inconsistent with the evidence as a whole; and they were inconsistent with Clagg's activities of daily living. (Tr. 32-33) These were all good reasons. Accordingly, the ALJ adequately complied with the treating source rule when she assigned little weight to the opinion of Clagg's treating physician.

Clagg also specifically argues that the ALJ erred by considering her activities of daily living when assigning little weight to Dr. Komitau's opinions. ECF Doc. 12, Page ID# 798-799. She cites *Gayheart v. Commissioner of Soc. Sec.,* 710 F.3d 365, 377-378 (6th Cir. 2013) for the idea that "activities of daily living are relevant only in so much as they document an ability to

perform activities on a sustained basis." She argues that the fact that she is able to drive, shop, wash and sweep floors does not indicate that she is able to engage in substantial gainful activity. This argument might be valid had the ALJ found that these activities established that Clagg was able to sustain such activities over the course of a day. But that's not what happened here. Instead, the ALJ cited these facts as the last of several reasons for discounting Dr. Komitau's opinions. Indeed, these reported activities do suggest that Clagg may have been able to sit or stand for more than 15 minutes. *Gayheart* does not hold that an ALJ may never consider a claimant's daily activities when evaluating the treating source's opinion. Here, the ALJ provided good reasons for assigning little weight to Dr. Komitau's opinions, including the fact that Clagg was doing more on a day to day basis than Dr. Komitau thought she could. There is no basis for reversal on this ground.

C.      **The Effects of Depression and Anxiety in Combination with All Impairments**

Next, Clagg argues that the ALJ erred in failing to consider her depression and anxiety in combination with her other impairments. 20 CFR § 404.1523(c) provides that the agency will "consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.") Clagg argues that her depression and anxiety are linked to her pain and she points to several medical records supporting this argument. Clagg contends that the ALJ's decision gave no indication that she considered Clagg's depression and anxiety in combination with her other impairments. She cites *Gentry v. Comm'r of Soc. Sec,* 741 F.3d 708, 726 (2014), in which the Sixth Circuit held that because an ALJ ignored the claimant's statements concerning the intensity and persistence of pain and the effect this had on her ability to work, and because the ALJ never considered the

claimant's diagnosed conditions collectively she had violated the agency's promises and requirements.

The Commissioner argues that the ALJ properly found Clagg's mental impairments to be non-severe and that she considered them in combination with Clagg's other impairments. The Commissioner points out that the evidence regarding Clagg's depression and anxiety was mixed. For example, Clagg generally appeared alert and oriented with intact memory during various treatments. (Tr. 23, *citing* 359-74, 405-408, 458, 518, 588) And, during the psychological consultative examination, plaintiff showed no evidence serious mental problems or functional limitations that would have affected her ability to work. The Commissioner contends that Clagg's reliance on *Gentry* is inapposite. In *Gentry,* the ALJ ignored record evidence supporting Gentry's complaints of pain. That didn't happen here. The ALJ considered the record evidence including Clagg's complaints of pain and explained so in her decision.

In *Burton v. Comm'r of Soc. Sec.,* 2017 U.S. App. LEXIS 23213, the Sixth Circuit, citing the ALJ's use of the plural word "impairments" and noting the ALJ's description several of the claimant's capabilities, concluded that:

> The substance of the ALJ's decision thus indicates that [he] did consider the total limiting effect of Burton's combined impairments. *See Loy v. Sec'y of Health & Human Servs.,* 901 F.2d 1306, 1310 (6th Cir. 1990) (per curiam) (holding that decision considered the combined effect of claimant's impairments where it referred to "'severe impairments' (plural)" and limited the claimant's working capacity in light of multiple impairments).

*Id.* at *4. Here, despite her determination that Clagg's depression and anxiety were non-severe, the ALJ included a lengthy discussion of these conditions in her decision. The ALJ explicitly stated that she had considered these impairments in combination with Clagg's other impairments. (Tr. 22) The ALJ cited records reflecting Clagg's reports of being very depressed and feeling like she wanted to die. However, the ALJ also noted

that, despite these reports, Clagg had never sought specialist treatment. The ALJ also noted that Clagg quickly stopped taking prescribed depression medications because she didn't like the way they made her feel. (Tr. 22, *citing* Tr. 372, 682) The ALJ also noted that Clagg did not appear to be depressed at her consultative examination. (Tr. 385) Instead, she seemed "upbeat," relaxed, and maintained eye contact as she spoke. (Tr. 385-386) As a result, Dr. Spindler found that she had no serious mental health problems or functional limitations. (Tr. 23, 388)

Regarding Clagg's argument that her depression and anxiety were linked to her pain, it appears that the ALJ did consider these impairments in combination. The ALJ cited records indicating that Clagg was depressed due to pain. (Tr. 22) But the ALJ also pointed to treatment notes suggesting that Clagg's depression and anxiety were not related to pain but to domestic stress. (Tr. 588)

As argued by the Commissioner, *Gentry* is distinguishable. The ALJ did not ignore key medical records. The ALJ's decision includes a thorough discussion of the evidence supporting and contradicting Clagg's disability claim. She expressly stated that she considered Clagg's depression and anxiety in combination with her other impairments and her decision contains sufficient analysis to back this up. I do not recommend remand on this basis.

### D.      Whether the ALJ's Pain Evaluation is Supported by Substantial Evidence

Finally, Clagg argues that the ALJ did not properly assess her pain or her credibility regarding her limitations. When a claimant presents pain as a cause of disability, the Sixth Circuit's decision in *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986) provides the proper analytical framework:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising

from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

Objective medical evidence of pain includes evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption. The determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals. Both alternative tests focus on the claimant's "alleged pain." Although the cases are not always clear on this point, the standard requires the ALJ to assume arguendo pain of the severity alleged by the claimant and then determine whether objective medical evidence confirms that severity or whether the medical condition is so bad that such severity can reasonably be expected.

When there is no objective medical evidence sufficient to support a disability finding, the claimant's statements about the severity of her symptoms must be considered along with other relevant evidence in deciding whether a person is disabled:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483 (July 2, 1996); *See also, Wines v. Comm'r Soc. Sec.,* 268 F. Supp.2d 954, 957 (N.D. Ohio 2003).

Similarly, 20 C.F.R. 416.929(c)(3)(i)-(vi) also requires the claimant's statements concerning pain to be considered, even when there are no objective findings that would explain the pain:

We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work … solely because the available objective medical evidence does not substantiate your statements.

Here, the ALJ analyzed the medical evidence in the record, noting findings such as a "strong grasp;" "5/5 muscle strength;" that Clagg was "able to independently stand with upper extremity assistance; independently sit supine;" she had a "symmetrical stance with and without cane;" relatively mild X-ray findings of degenerative disk disease with slight progression; gaps in treatment; and instances when Clagg did not use the prescriptions or devices that were recommended. (Tr. 27-30) The ALJ found that Clagg's medically determinable impairments could reasonably be expected to cause her alleged symptoms. But she also found that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 27)

The ALJ's credibility findings are entitled to deference because she had the opportunity to observe the claimant and assess her subjective complaints. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001). However, the ALJ cannot decide credibility based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. When a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."

The regulations set forth factors that the ALJ should consider in assessing credibility. These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of

medication; and treatment or measures, other than medication, taken to relieve pain. 20 C.F.R. §

416.929(c)(3)(i)-(vi). If the ALJ rejects the claimant's complaints as not fully credible, she must

clearly state her reasons for doing so.

Here, the ALJ noted several examples of Clagg failing to receive recommended

treatment. She was too busy to get injections for her knees. (Tr. 28) She stopped going to

physical therapy and stopped participating in aquatic therapy. (Tr. 28) She did not get splints and

later stopped using them for her wrists. (Tr. 30) The ALJ also properly considered Clagg's daily

activities and some inconsistency in Clagg's statements. The ALJ explained:

> As for the consistency of the claimant's allegations with the objective evidence of
> record, her daily activities are not limited to the extent one would expect given
> her allegations. At the hearing, she asserted a limited lifestyle. For example, she
> claimed she needed assistance with household chores and personal care
> (Testimony, see also 5E). However, the record indicates that she performs a
> variety of activities. She drives her daughter to and from school, cares for pets,
> prepares the meals, drives, goes shopping, watches television, sews, plays games
> on a Kindle, and attends Church services, weekly (5E/7-9; 3F/7; 4F/5)

> The claimant has also made a number of inconsistent statements. For example, the
> claimant reported that her cane was prescribed by her physician. (4F/4). However,
> there is nothing in the record to support this assertion. Additionally, the claimant
> testified that due to her impairments, she was not meeting production
> requirements and that she was afraid that she would be fired. However, in her
> work activity report she stated:

> *I kept working and continued to work at my own pace. I did not miss work on*
> *account of my illness. The employer has a tracking mechanism and aware of my*
> *production. I did not slack or the production. I decided to leave after a severance*
> *was offered to employees with many years of employment and wanted to retire*
> *with the company.*

> Additionally the claimant testified that from 2006 to 2013, she worked from home
> at a computer all day, did not interact with customers, and went downtown to
> Medical Mutual for meetings on rare occasions. However, in August 2013,
> treatment notes indicated that the claimant was going "down to Cleveland for
> about a month" and not working out of house (3F/13). Finally, the claimant
> testified that in 2014, she sought part time work, but was not able to find
> anything. Furthermore, at a physical therapy evaluation in Oct 2013, she reported
> that she was "offered severance package; last day of work probably end of

November. Plans to apply for Social Security Disability," which raises a question as to whether her continuing unemployment is actually the result of her impairment.

(Tr. 31)

As noted above, we are required to defer to the ALJ's credibility findings because she had the opportunity to observe the claimant and assess her subjective complaints. Here, the ALJ concluded that Clagg's alleged pain was not as severe as represented. This finding is not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001). The ALJ stated objective reasons for her credibility determination and it should not be reversed.

All of Clagg's arguments are supported by evidence from the record. However, the ALJ also supported her decisions on each of these issues with evidence from the record. The court cannot overturn an ALJ's decision which is supported by substantial evidence even if it might resolve the factual issues differently. *Foster*, 279 F.3d at 353. I recommend that the ALJ's decision be affirmed.

## VII.    Recommendations

The ALJ's decision is supported by substantial evidence in this case and Clagg has failed to identify any error of law in the proceedings at the administrative level. I recommend that the final decision of the Commissioner be **AFFIRMED,** pursuant to 42 U.S.C. § 405(g).


Dated: December 12, 2017

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).